Thank you, panel. I'm honored to be sitting with Judge Edith Jones, who's the IG on our panel, and Judge Jean Davis. Judge Jones was unable to physically be present, but she is present on the monitor. And yesterday, I think whatever initial bug we got out of the sound system, it really worked well. I think she could hear counsel well and, you know, went pretty smoothly. So at any event, we'll look for as long as you, you know, stay in the mic, not shouting it, but just stay in the mic and keep your voices up. We'll be able to hear you and move it. So the call number 25S10234, United States v. Young. Mr. Lee, you're up first, sir. Thank you, Your Honor. May it please the Court, my name is Stephen Lee. The government's evidence of willfulness against Dr. Young here was insufficient as a matter of law, because the government's case was based on a fundamental and incorrect understanding of the legal requirements and the medical require, Medicare requirements as they apply here. There's a lot of confusion about this in the trial. There's a lot of confusion about this in the government's brief. So I do want to be very clear about this. Okay, let me ask you, are you trial counsel or you're on appeal? I am trial counsel and on appeal. But you were there? Yes. Good. We just love when we have the actors from below to be there so the questions can come to you in that vein. Okay, keep moving. Yes, Your Honor. In the 2016 to 2019 period, which is the relevant period here, doctors were not required by any law or any Medicare regulation to personally examine or talk with patients before ordering braces or genetic tests. Doctors were allowed to rely on others to conduct examinations and they could form valid physician-patient relationships without having such examinations or calls. And that's why Dr. Young believed that what he was doing at the time was legal. The government's case is premised on a fundamental misunderstanding. It is now the law, as of 2022, that face-to-face encounters are required for some of the braces at issue here. But that was not the case in 2016 to 2019. Mr. Lee, the law may not have required it, but Dr. Young certified that he personally examined his patient and assessed her condition. That's not correct, Your Honor. Well, if he was using the DMIRNAC's software, that certification appears right above where he clicked his signature. No, it did not, Your Honor. The screenshots show, all the screenshots that were shown at the trial show that there was a button to click on that could pull up the final chart that was auto-generated by the DMIRNAC system. As Dr. Young and the government's own witness, Dr. Haas, testified, doctors could and did complete the charts from their point of view without actually looking at those auto-generated charts. Well, that's inconsistent with the tutorial of that software. The tutorial said, and it was shown to the jury, that you had to complete items one and two and all the way down before you could get to that signature. Yes, Your Honor. And I want to explain this because this is a point of confusion, I think, and this is something that needs to be clarified. There were multiple types of charts involved in this case. The only charts that had the personally examined language were some of the DMIRNAC charts, not all of them. The DMIRNAC system changed the language over time. There's actually a separate trial, separate case going on in Florida involving the DMIRNAC system designers. But what happened here with Dr. Young, he was able to look at the chart. It was mostly filled out before him. False information had been put in, and he was able to approve the braces without looking at the final chart. Was there anything in that portal, though, anywhere in that 12 or 15 page download that authorized him to rely on a nurse's examination of the patient? That's actually common medical practice. I didn't ask you that. There is nothing in the charts that said, I'm sorry, there's nothing in the charts that said he... That authorized him to, or where he would certify that he had reviewed the nurse's chart or that authorized him to use a nurse rather than do the examination himself. There's no language like that in the chart. There's no language in like that in the DMIRNAC that was his understanding based on what he was told by people like Steve Kahn, who told him that nurses had prepared these charts. I mean, let me ask you this. In other words, he admitted that he never seen these patients, never talked to the patients. And how could he check that box honestly and say that he personally performed the assessment of a patient for the prescribed treatment and device and verify that it's reasonably and medically necessary? How could he sign that when he'd never even talked to the patient? Your Honor, if there was evidence showing that he had seen that language and that it had been, let's say, above the button he clicked to approve the charts, this would be a very different case. That language did not appear in the system that he saw. It was all added to the chart afterwards without his knowledge. There's no evidence that he knew of that language. Is there any evidence in the record that this language was not on the portal of the DMIRNAC's portal on any of the patients he examined? Yes, Your Honor. Well, the only evidence that was shown about what was shown to Dr. Young was basically through those training videos. They were several minutes long. The jury would show them multiple times. There was nothing in the training videos that had any reference to that kind of language. So that's why this was part of the way that the DMIRNAC system basically helped use and deceive the doctors. Again, we acknowledge... Let me ask you a question. This is Judge Jones. Let me ask you a question. It's not easy to become the fifth highest person doctor in the United States ordering Medicare braces. You've got to order hundreds, if not thousands of them, which Dr. Young did. And it seems to me it's not easy to be a full-time emergency room physician, which he was, and order at the same time dozens of braces, multiple braces for individual patients, some of which conflicted with each other, while you were also ordering genetic tests for another on a very, very high volume. Couldn't the jury string all those things together and say, this is beyond belief, that a sophisticated doctor did not know what he was doing? Your Honor, there are... A lot of those facts may well go to showing that Dr. Young was negligent. It may well go to showing that he was reckless. But for a criminal healthcare fraud case, the government has to prove that Dr. Young acted with knowledge that his conduct was illegal. So the speed with which he did these orders is actually not surprising, given the way what he was told. He was told that these were braces... But you're deflecting the question, Judge Jones, asking not that she needs me to intervene. But I mean, you're claiming he's oblivious to all of this that occurred. I mean, basically, you're claiming he's just so attenuated from all this that he doesn't know, yada, yada, yada. And you sort of heard her question, and you're not really answering it. I mean, this was a jury trial, not a guilty plea. Yes, Your Honor. And he testified. The jury looked at it. And so all of that you're saying, presumably was said, got jury instruction. And the question Judge Jones asked, couldn't a jury reasonably believe that he did have the intent? I mean, why is that reversible error? Your Honor, I think two things. First of all, I do think the evidence overall, it is far from overwhelming. And the evidence here... Doesn't have to be overwhelming. It just has to be proof beyond reasonable doubt. You know that. Yes, Your Honor. But we also asked for a new trial, because the evidence here, at best, is a close call or kind of an equal pose situation. Juries decide close calls all the time. You haven't alleged any... I mean, you had a submitted jury charge, but you hadn't really said the trial was somehow off the rails. You're essentially, as good lawyers should do, trying to reverse the jury verdict. I mean, he got on the stand. And you haven't attacked the indictment to say, OK, what the jury charge... I mean, the government... I see the light. I got a watch, and I see the red light. So you don't need to look down at it. I won't teach you on your time. But my point is that you haven't attacked the indictment to say, well, what the government charged was not a crime. That's not the case, right? Well, Your Honor, we are arguing that in terms of the trial and in terms of appeal. Because again, the issue here, the government, basically, they argued an incorrect version of the law. That basically, their main argument at trial, throughout their arguments, throughout their witnesses, was that Dr. Young was required to have phone calls with patients. And because he didn't have those phone calls, he is guilty of health care fraud. That's simply not a correct statement. So you're saying the government sought to prove recklessness, negligence, or some version of that, but not a crime. Is that what you're arguing? Your Honor, the evidence did not show that Dr. Young believed these braces or genetic tests were medically unnecessary. He believed that based on the false information he was given and the bad criteria he was given by his employers. So the evidence did not support the idea that- So he throws everybody else under the bus. He doesn't know. With all those credentials, he doesn't know. He just did what he thought other people suggested. No, Your Honor. He actually believed that he was authorized to review the charts that were prepared by other medical professionals to make medical decisions based on those- And he probably said that on the stand. Did he not? Yes, Your Honor. And the jury didn't believe him? Yes, Your Honor. But even so, the evidence here was insufficient as a matter of law, or at least it warrants a new trial, where a trial can be done with proper instructions. All right, let me ask you this. I know the red light's on. Give him a minute. Tell me, number one, what is the primary legal error that you are relying on? We know you argue insufficiency, but what's the principal legal error you say permeates this trial that warrants a new trial? The government, like they did in the Ganji case, argued for Medicare requirements that don't actually exist. Telephone calls were not required in order for Dr. Young to order braces or genetic tests. That was not the law. That was not required. Dr. Young could not have acted willfully in violating, given that he was doing things that he believed were legal and that were, in fact, legal. And we asked- Well, that doesn't justify making a false certification on the paperwork going to Medicare that he has assessed the needs of this patient. Again, Your Honor, there was no evidence that he knew that that language was- You had the software tutorial, and the only evidence that he couldn't see that until after he signed. His testimony is the only evidence of that, isn't it? Your Honor, no, that's not correct. Shannon Haas acknowledged that she also could and did approve braces without seeing the language that was generated by the DMIRF system. This is perhaps like one of these other online situations where people are- When you sign up for a service like Amazon or Netflix, you are supposed to read every single thing that pops up that could pop up in the user agreement. Not everyone does. But he's a sophisticated person. That's the question Judge Jones put to your argument. It's as if he's somebody who just got out of med school or, you know, he's just sort of very distant from the process. The jury saw him. I mean, he's presented, you know, doctor with great credentials and so forth, but you're saying it was a reversible error for the jury to not accept that as the case. So, I mean, you preserved your rebuttal time, but we wanted to make sure we understood. But you reserved- No, well, your co-counsel. But anyway, you've exhausted your time. I think we get yours. So we'll hear from Ms. McCullough. Thank you, Your Honor. All right. Thank you. May I please the court? Yes, sir. This is Mike McCullough, and I'm going to present and switch gears here on the venue issue. Just like the government was wrong about the law that was underpinning its case to prove the conspiracy, it was completely wrong on the law of venue. The government thought that it could squeeze venue in the Northern District of Texas for the conspiracy count based only on the physical addresses of the DME suppliers and Medicare beneficiaries, not through the overt acts of either Dr. Young or alleged co-conspirators. Same with the false statement counts, relying on the downstream effects of the statements, not where they were sent or received. The district court apparently thought the same things, and that as it held the DMERX orders were transmitted to the Northern District of Texas when Dr. Young pressed the OK button. Mr. McCullough, when did you raise that issue, venue? We first raised the issue in jury. Was it forfeited? It was. We would argue, and I have argued, Your Honor, that it is not forfeited, and I'm happy to go into that, but we are also very prepared to discuss why this case needs to be reversed, even under the plain error doctrine and each of the four prongs of that doctrine. If you'd like for me to get to that now, I will, but I would like to discuss first how clear the error was and why it was there. Well, be sure you get to that. I will definitely not forget to get to that, Your Honor. So the government realizing that it did not have a good venue case, by the way, these prosecutors were based in Dallas, and it's long been held that the convenience of prosecutors is not a sufficient basis for fixing venue. The government really, in a, I guess, a Hail Mary attempt to salvage venue, has, is urging this court to change the law rather significantly, which I'll get to momentarily. The undisputed facts are that Dr. Young lived and worked in Fredericksburg, Texas, in the Western District in the Hill Country. He reviewed patient charts and signed the prescriptions from the Western District. The companies he worked for, Sunrise Medical and Momentum, were based in Florida. The government concedes that Dr. Young performed no acts in the Northern District. For, let's start with the conspiracy count, the essential offense conduct, which is this circuit's standard for fixing venue, is two things. Formation of the, where was the formation of the agreement, and where were the overt acts by co-conspirators committed? The government did not introduce any evidence of overt acts committed by a co-conspirator or alleged co-conspirator in the Northern District. So they are urging this court to expand the law to a new theory that's never been endorsed here, that acts caused to be taken by others can establish venue. Look at the four things that they cite, the braces being delivered to beneficiaries in the Northern District. Who were these DME companies? Who were the actual shippers? No evidence that the DME companies were co-conspirators or had any knowledge of the conspiracy. These companies would get these prescriptions unbeknownst to Dr. Young. They packaged them up. It's like a bank packaging on mortgages and would sell them to DME companies who would then have higher shippers to ship the braces. They would do the fulfillment. Very much downstream, way downstream from Dr. Young. They were not co-conspirators. I'd like for you to argue when this was raised because, you know, venue is waivable. You can waive venue. Yes, Your Honor. And there's clearly an issue of, I would call it forfeiture as opposed to waiver. Maybe that's just semantics. But I'll get in a moment to why this is clear, plain error. So you agree you didn't raise it until after trial? We did not raise it until jury argument. You know, the point of this circuit's rule that you should follow Rule 29 motion at the close of the government's evidence is to bring it up when the government, the court, maybe can do something about it. Maybe there's a way to fix the problem. And we did bring it up in jury argument. And this court has held that the district courts have the right to reopen, to allow a party to reopen the evidence all the way up until the jury's deliberating. And so at that point, the government could have said, whoa, you're right. We need to judge. We need to reopen. And the court had to show plain error to prevail on this issue, right? I don't conceive that, Your Honor. But it is plain error. And this court has held that when it's unclear whether plain error or regular error is the standard of review, that this court just defaults to plain error and can decide it that way if the error is clear and plain. When you say you raised it during jury argument, you mean just before the argument occurred? That's when you raised it with the judge? Is that what you're saying? Well, we raised it to the jury in front of the judge and the government. But it was raised at a time. Well, I mean, I get it. But the jury wouldn't be deciding venue. I'm just trying to... Anyway, when you raised it so that the judge was fully aware that, OK, this is an issue to be dealt with, that's what I'm talking about, not the jury. But I understood you to say chronologically it was before the argument was going to be made. But you raised it to the judge, which I assume the government had some reply in the record. Is that right? Yes, Your Honor. And I was the one that argued that to the jury and made it clear there was no... We couldn't find any evidence that they had established venue in the Northern District. Did the judge make a ruling? I mean, I know it went ahead. Did he affirmatively respond, so to speak, to your raising it at that point? He did not respond at that point. The government did, but did not ask to reopen the evidence. Everyone felt, they all felt that the evidence was sufficient. My point is only, not to repeat, but that we brought it up at a time when it put all the parties in the courtroom on notice of the problem at a point when there still was something that could be done about it. The reason it's clear error with regard to the conspiracy count is that there was no evidence of overt acts by a co-conspirator in the Northern District of Texas. For the false statement counts, it's long been the law of the circuit, black letter law, that in any false statement case, the government in the Chenault case, this court in the Chenault case, held that for all the various false statement offenses, the venue lies in the district where either the statement was sent or where it was received, those two places. Really, most of this court's jurisprudence deals just with the place where it's sent. There's a case from 1955 that says . . . All right, let me ask you this, just as you go to your seat. Best case scenario is not forfeited, but arguably, but assume an arguendo is not forfeited, but at best, you've got to get over the hump. It would be the plain error, right? All right, so my question is just, as to the conspiracy charge, what is the principal case that you are relying on that fits a scenario here where the issue is raised before a jury retires on the venue, and likewise, as to the false statements, is there a case or cases dead on point that you're relying on? There's not a case where it's raised for the first time in jury argument and where that's ever come up. This court has held, though, the substance of this court's holdings is bring it up before . . . while there's still time for something to be done about it, for the jury to at least attempt to correct the evidentiary deficiency. All right, so I'm saying, assume an arguendo, we determine it was raised some kind of way. I'm not saying that we've come to that conclusion, but then what's the best case, the strongest case you have that, even assuming that, that reversal should occur here? Well, because, Your Honor, it just clearly and cleanly fits within the four prongs of the plain error doctrine. Usually the most problematic prong in each case is the third one, which is affecting substantial rights, which this court translates into whether you can prove you were harmed, whether you were prejudiced by the error. All right, so I asked you for a case, but you're giving me the doctrine. I got you. I just want to make sure, at least I understand clearly where you're coming from on it and what cases that you're relying on since you're asking for that relief. So we have your argument on the venue, Matt, as your time is expiring. Thank you, Your Honor. All right. Thank you, sir. All right, Ms. Allen. Thank you, Your Honor. I'd like to just pick up where we left off discussing venue. So my understanding and recollection is that they asked for a jury instruction regarding venue for the conspiracy count. I think that that's what counsel is referring to when he says that he brought it up. The first time that they argued that there was insufficient evidence to establish venue was after the verdict in the motion for judgment of acquittal. Under this court's published decision in plesia, that means that the argument is waived, and they have offered no response to plesia. And we think that even if this court does review for plain error, they haven't shown that any error was plain or met the third and fourth prongs of plain error. On the sufficiency claim, I just would like to start out, again, obviously, as you all know, for appellate review of sufficiency claims, the evidence must be viewed in the light most favorable to the government. And if any rational juror could find the elements of the offense beyond a reasonable doubt, then this court must affirm. And here, there is a lot of evidence of Young's willful participation in the conspiracy. And just to briefly go over the categories, there was testimony at trial that he was paid to just sign prescriptions. And there was lots of evidence at trial from which the jury could infer that he was just rubber stamping thousands of prescriptions rather than making a medical necessity determination. And he doesn't dispute that he was required to make a medical necessity determination. And indeed, that's the reason why Medicare requires doctors to sign prescriptions. And just to go over those categories of evidence quickly, he signed prescriptions with false statements in them. He signed pre-filled, templated prescriptions. He signed an extremely high volume of prescriptions that other doctors that were actually in the field testified that they would never be able to do. He signed them extremely quickly. There was evidence at trial that there were multiple patients that he signed prescriptions for in the same minute, that he preferred DocuSign so that he could do large folders all at once, that he would sign also testimony, he'd sign 25 prescriptions within 20 to 30 minutes. The prescriptions included multiple braces per person, sometimes as many as 11, but often five and six, seven and eight. And then there was also expert testimony from doctors that even if all of the information in the prescription, sorry, even if all the information that he was seeing was correct and had been entered by a nurse, it's still, no doctor could find that those braces were medically and reasonably necessary. And that's because it was just so little information and it's not medically appropriate to prescribe an orthotic brace every time someone has pain or every time someone requests one. And there was expert testimony from two doctors about that. And then lastly, there are all of the red flags. And for each one of those, they started in 2017, for each red flag, he had an explanation that he gave to the jury about why it wasn't a real red flag. And the jury was entitled to weigh that and determine that it was. So we think- Well, Ms. Allen, I have a question. Are you planning to respond to their contention that the government footed much of its case on the idea that Medicare did not require in-person contact before the prescriptions were issued? Yes, Your Honor. So Young is trying to make this into a debate about what specific regulations expressly stated were required for particular types- Well, did the government ever misrepresent the status of the regulations? No, Your Honor. On cross-examination, Quindoza was asked whether there was a particular regulation that expressly stated that face-to-face encounters were required for this type of prescription. And he said he agreed that there was not an express regulation that said that, but he explained that that doesn't change the fundamental requirement that the doctor is responsible for making the medical necessity determination. Well, that may be the case, but their position is that you argued Medicare regulations numerous times. Well, Your Honor, we- The government did. I think if you take all of the testimony together, it shows that in order to make the medical necessity determination for these types of braces, you would have to perform objective tests on the patient to determine that they were necessary. And that's what Dr. Hoover testified to. So even if there wasn't a particular Medicare regulation that specified for these particular braces that it was required, Medicare did require a treating physician to make a determination that the brace is medically reasonable and necessary. And then Dr. Hoover testified that a doctor can't do that without actually listening to the patient's subjective complaints and then performing objective tests on the patient. So again, and this came out on cross-examination and they made the same argument to the jury. And a lot of the evidence here, I mean, Young also gave his login credentials to these companies. He's signing prescriptions that have false statements. What does that mean? What does it mean that he gave his login credentials to the companies? I didn't understand that in the briefs. Sure, Your Honor. So the DMERX platform, which is one of the platforms that he used to sign the prescriptions, in order to sign them, he would have to log in just like you would log into your email. And the reason for that is to ensure that it's the doctor who's actually clicking the buttons to sign the prescriptions. And he gave that information to the companies so that they could go in and they could choose what tests had been done. They could choose what prescriptions, sorry, which braces would be prescribed. So that they could check all those boxes and fill all those things out for him. Do you have any evidence that that happened? Yes, Your Honor. There's testimony from Edwin at Sunrise that they would pre-fill out the prescriptions in the DMERX platform so that the only thing left for the doctor to do is click the button. And also, just to clarify regarding the false statements and the statements that he had personally performed assessments, there was evidence at trial, and again, we're on sufficiency review, so we're viewing the evidence in the light most favorable to the government. He, sorry, there was evidence at trial that a doctor could not sign, click the button to sign the prescription without first previewing the narrative format of the document. And Dr. Haas testified that she didn't read that. That's the testimony. That's what she said at pages 3005 of the record. The question was, but you didn't actually read them before signing, correct? And she said, correct. So the fact that she didn't, that she personally didn't read them doesn't mean that a doctor, you know, could sign the prescription without seeing the full narrative format. It just meant that she didn't read them. And even the next page, she testifies that she, that when the government points- That's not relevant to Dr. Young's position, though. Well, Your Honor, they make a lot, they are arguing that a doctor, that there was no evidence that Dr. Young saw the false statements stating that he had performed assessments. And in support of that argument, they rely on Dr. Haas' testimony, and they say that Dr. Haas testified that she could sign the prescriptions without ever seeing it. And my point is just that her testimony was that she testified that she didn't actually read it, which is different and doesn't undermine- I understand. But I'm not, all right, whatever. That's a small point. Let me draw you back to venue for just a second, though, because is it a waiver or forfeiture of a venue claim to raise the issue on count one in a jury instruction? Is that a forfeit? Is that too late? I think so, Your Honor. I, he didn't argue- You relied on the, you relied on the Pleasia case, and that was after, after trial or after the jury had come back, wasn't it? Yes, but I don't think asking for an instruction for the jury regarding what counts for purposes of determining venue is the same thing as arguing that there, that there was insufficient, insufficient evidence of venue presented at trial. And the first time that Young made that argument was after the verdict. Okay. Well, I hadn't, I need to look at it more closely, but I don't, I've seen, like, possible contradiction to me. Okay. If there are no other questions, we urge the court to affirm. We think there was significant evidence of all of the counts here, and this court should affirm. Thank you. Let me just ask you one thing. Sure, Your Honor. Yeah. On the genetic test, was there anything in the paperwork that he signed that was false on the genetic testing? Well, Your Honor, I, I, those were, the genetic tests were not the base, the basis of the false statement counts. The evidence regarding... It was on the conspiracy count, wasn't it? It was, Your Honor. And the, the, excuse me, just one second. The, the evidence regarding those tests, Dr. Maglioco testified that, that none of the, none of the orders that he reviewed were medically reasonable and necessary. But I don't, there was not, if your question is, is there, you know, was there a specific statement about doing a particular test? There was not. But again, there was lots of other evidence that he was doing the same sort of rubber stamping with these prescriptions. He's signing them, he's signing the prescriptions after the samples have already been collected, which Dr. Maglioco said is not appropriate. That how, if a doctor is actually treating a patient, what they would do is they would first talk to the patient. They would talk about what these tests might show. They would get the patient's informed consent. And then once they had decided to move forward, they would get, then get the sample. And that's not what was happening here, where... I mean, would Medicare worry about that though? I mean, the timing of the blood test? I mean, how does that indicate fraud on, you know, Medicare fraud? Well, I think it's one of many things here that shows that Dr. Young was not actually making a determination about whether these tests were medically reasonable and necessary, but instead was just rubber stamping these prescriptions. And the other things that... What does the government or Medicare claim that he should have done that he didn't do? Sure. Well, he should have... First of all, one of the requirements for Medicare for reimbursing a genetic test is the patient have cancer, has a personal history of cancer, or have cancer symptoms. And Young signed numerous, many, many tests that didn't show... that didn't have any of that in the patient's file. Instead, they were just... Even in the history that the patient gave? That's correct. Instead, it was just based... It was just that the patient had a family history of cancer, but not that the patient had a personal history of cancer. In addition, Magliocco testified that the prescriptions were not medically reasonable and appropriate because they were templated prescriptions. There were no physician notes at all in the prescriptions. Again, that it was abnormal to sign after taking the sample and that there was no personal history of cancer or any symptoms of cancer. The family history was not enough to justify the test? That's correct. And Dr. Magliocco and Quindoza both testified to that at trial. And again, we're talking about the sufficiency of the evidence, whether there's any evidence in the record viewed in the light most favorable to the government. And I would also point out that there was also evidence at trial that after Operation Brace Yourself, when the DME conspiracy started going down, Young tried to convince Sunrise to start doing the genetic test and making money that way. So I think that's also an inference that the jury could draw, that he was working for these two different types of companies and rubber stamping prescriptions in order to get paid. And the jury could infer from that that he was willfully engaging in conspiracy with respect to both of these types of tests. May I add to this? If we should conclude that the evidence was not sufficient on the medical testing ground, how would that affect the dollar amount of what is it? What's the word? The loss amount? Yeah. Well, Your Honor, again, so for sentencing purposes, I think that the question is whether there's a preponderance of the evidence, viewing the evidence in the light most favorable to the government, because I think this is definitely relevant conduct to the conspiracy. And to answer your specific question, let's see. It looks like the loss findings in the PSR were that $34.5 million were from the DME and $37 million were from the genetic testing claims. But again, we think that there is sufficient evidence regarding the genetic testing claims as well. And the district court specifically found that the findings in the PSR were reliable. Thank you. Anything else, Judge Shultz? Well, on the venue, on the false statements, what's your best case that the venue is appropriate or is your best case that it's been forfeited? Well, Your Honor, we don't have a case directly on point about what is required under this particular statute. And as we point out in our brief, this court has held that there is no plain error when there isn't a case addressing the particular statute, because venue is a statute-specific determination. And here, as we note in our brief, one of the elements of the offense under 1035A is that the false statements are in connection with the delivery or payment of medical care. And that hasn't been addressed by this court. And Young hasn't pointed to any court that has addressed it. He refers to other false statement statutes. OK. Thank you. Even assuming that we reject his argument on that, does this case require that we write or explicate on that nuanced point? I don't think so, Your Honor. It would be enough for this court just to say that this court hasn't previously addressed the statute or to find that he hasn't satisfied the third and fourth prongs of plain error, which this court has held in other cases that we cite in our brief. And again, our frontline argument is that it's waived altogether. OK. All right. We have you, I think. Anything else from the panel? All right. Thank you. All right. Back to Mr. McCullough, you're the anchor person. Thank you, Your Honor. I'll try to talk fast. I've got about 15 things to cover in three minutes. It doesn't help. You do better. So we can hear you, don't we? Talk fast, and we don't know what you're saying. I understand. So it's a conundrum. So just to go through them very quickly, Your Honor, the testimony from Dr. Quindosa was, I have it here. And he says the doctor has to actually see the patient or evaluate the patient to make the determination. That's their witness. So they did take the position throughout the trial. You have to have face-to-face contact or at least a phone call with the patients. That is not the law. And that permeated the evidence and infected and corrupted, we think, the jury deliberation and the jury process. With regard to, I want to also mention, it didn't come up earlier, Dr. Craig, who testified that he sniffed it out at some point, that he thought it was a fraud. That's highly prejudicial. It's not relevant. He had very, very different experiences. He came into the thing differently. He saw different things, had different conversations. That was clearly irrelevant. We objected, objected. The court let it in. We believe under that Kaplan case from the Second Circuit, because there's not a Fifth Well, you know the law is you're constantly entitled to a fair trial. But he's not entitled to a perfect case. Correct your honor. So it's rare, you know, to assume an arguendo if you got your shots in with the trial judge, et cetera, et cetera. I mean, you know, it's highly unlikely, you know, that we'd flip the case just based on it, even assuming you're right. Judges have to make quick calls on, you know, what's marginally relevant, et cetera, to the government. You know that at that point. But we get your point, you know, on it. It's a rule 403 issue, whether the prejudicial effect outweighs the very, very slight relevance. Assuming that your sufficiency arguments, and we have them, you know, we got them. So, and you're a man, what's your juggernaut otherwise? Okay, juggernaut otherwise, several things. I want to come back very quickly to the issue of plain error. We're happy for this court to analyze this under plain error. Here's why it's plain. First of all, the court has held for the various false statements, that's in the Chennault case, various false statements, statutes, where it's sent or received, period. The government would like to expand that to the circumstances. That's never been the law of the circuit. It's really never been the law of any circuit. And you get to that third prong, can you show there's prejudice? This is fundamentally different from a trial error of an erroneously admitted piece of evidence, or some flawed jury instruction, where you can conceptually go back and analyze the evidence and determine did this really probably affect the outcome. You can't do it with this. This is fundamentally different. A venue vicinage error affects the entire adjudicated framework of the case. Well, if it was so poignant, counsel, why, pray tell, was this raised so late? If venue was improper, it was improper from Jump Street, to put it another way. I'm not saying you necessarily lose, but I'm like, venue is kind of straight up. You know, it's not one, oh, by the way, you know, the venue is bad. Got the indictment. It's complex. You know, we're talking about the district, et cetera, et cetera. I'm just not understanding. You know, sophisticated lawyers, you know, not an issue. You know, sometimes laying under the log is the way it used to be framed. You know, the way to get to this point, oh, by the way, we shouldn't be here. And, you know, we have plenty of cases. I'm not suggesting that that's what occurred here. But it did get my attention to be getting a venue issue argued poignantly on two matters, false statement and conspiracy, just before the judge is about to charge the jury. What I know good and well, the judge had charge conference, et cetera. There's all this. You got multiple lawyers and so forth. But now to say it's so explosive that the whole case goes kaput, you know, it's an argument. But I'm just saying for one judge, you know, it just, you know, anyway, it makes me think that if it was all that, it would have been raised a whole lot earlier. Because the point is to alert the judge who wants to go through a full trial if you're in the wrong place, you know, not the case. So anyway, that's just a point. But we get your venue piece. You've argued it and so forth. What I want to ask you is, you all rely on Ganji, which was written in 2018. I don't remember all the cases I've written, very few. But I do remember writing that one. And we found that, Dr. Ganji, the evidence was insufficient. Me, with that, I read this record. I'll just tell you from my eyes, I don't see this case as the same as Dr. Ganji's case. So you got about 30 seconds, slightly more, to tell me why I'm wrong, how Ganji fits this case. But what the key points in Ganji were that, you know, he did not have direct interaction. It was a she. It was a she. I'm sorry, it was a she. I do remember the case, no gender at all. Okay. And did not have direct interaction with the patients. That was rejected. And really what that case came down to was the government had proved that she should have known better. It's sort of much more of a civil standard. That they just, she just had to know, she should have known. That is what the evidence at best showed here. That Dr. Young should have known. Certainly in retrospect, 2020 hindsight, armchair quarterback, we look back on it a year or two or three later, you know, emails can look like red flags that didn't look like red flags at the time. And Dr. Young, as my colleague said, there's no evidence that he didn't believe what he was doing was all legal. The main, the crux of the government's case was that it was illegal because he wasn't talking to the patients. Yes, there was, and that was incorrect. As Judge Jones has brought up, the volume, there's, yes, there's a lot of volume. Like some of them, one a minute. These are really easy decisions. Braces are easy decisions for doctors to make, especially a 30-year emergency room doctor who has to make hundreds of split-second decisions every shift, often based on charts that he didn't prepare. All right, I'm going to stop you. You're another one of those. Let me just ask you this. Go ahead. Well, if we decide that there's a jury question on whether he saw that attestation before he signed and clicked on it, what's your argument that he was entitled to say that he falsely say that he had personally assessed the patient's need for that brace? I'd make two points to that, Your Honor. First is he did personally assess the patient's need for the brace because he looked at the chart and determined, made a medical decision each time on whether a brace was necessary here, there, wherever the patient was feeling pain. He does that in the emergency room all the time. And then earlier in the download, some of that information in the 10 or 12 pages, he said he examined the patient. He said that he went through tests that he conducted. And, Your Honor, he did not do that. The government tried to make that claim. The actual evidence never showed, they never proved that he saw that. They never were able, they didn't introduce any forensic evidence showing that he pressed the button, that extra button that would have allowed him to review the chart that he had just filled out. And he didn't think that was necessary. The jury could have believed the evidence that the software required him to read that. Isn't that true? That was, there was conflicting testimony on that. Correct, correct. We would say the jury did not have the right to just believe that, to show that he actually did see it. He testified he didn't. And the jury could have disbelieved that, right? Well, the jury could believe or disbelieve anything. Correct, Your Honor. But in this case, there was no evidence that he ever saw it. And he testified if he had seen it, he would have, whoa, stop. I didn't, I didn't, I didn't personally. All right, I'm going to stop you at that point. You're sounding like you're going into a jury argument for us. Judge Jones, any additional questions? No, thank you. Okay, thank you. All right, counsel, thank you. We have the case, very interesting case, complex. We've read a lot of the record already, as hopefully you can tell from the questions. But we will thoroughly go through every stitch of it. And we'll get the case decided in due course. So thank you from the government side for good briefing and responsiveness to the court's questions. Thank you, Your Honor. All right, this concludes the oral arguments that we have set for today. So the panel will be in recess, well, a panel will be in recess until tomorrow. 10 minutes, Judge Jones, will that work? Yeah.